IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALMEDA MALL, L.P.,                    §
                                      §
              Plaintiff,              §
                                      §
v.                                    §
                                      §
SHOE SHOW, INC., SHOE SHOW,           §      CIVIL ACTION NO. H-08-2940
INC. d/b/a THE SHOE DEPT.,            §
INC., and THE SHOE SHOW OF            §
ROCKY MOUNT, INC. d/b/a               §
SHOE DEPT.,                           §
                                      §
              Defendants.             §

## MEMORANDUM OPINION AND ORDER

Almeda Mall, L.P. brings this action against Shoe Show, Inc.,
Shoe Show, Inc. d/b/a The Shoe Dept., and The Shoe Show of Rocky
Mount, Inc. d/b/a Shoe Dept. (collectively "Shoe Show") alleging
breach of a shopping mall lease agreement.  Pending before the
court are Plaintiff, Almeda Mall L.P.'s Motion for Summary Judgment
(Docket Entry No. 31) and Shoe Show's Motion for Summary Judgment
(Docket Entry No. 32).  For the reasons explained below, the court
will grant Almeda Mall's motion as to liability, but will deny it
as to damages and will deny Shoe Show's motion.

## I.  Factual and Procedural Background

Almeda Mall is a Delaware limited partnership with its
principal place of business in Texas.  Shoe Show is a
North Carolina corporation with its principal place of business in
North Carolina.  Shoe Show is a shoe retailer that operates

approximately 1,100 shoe stores across the country under the trade names SHOE SHOW, THE SHOE DEPT., and Burlington Shoes.[1]

Shoe Show entered into a Lease Agreement with San Mall, L.P., Almeda Mall's predecessor in interest, on December 31, 2002.[2]  The Lease allowed Shoe Show to occupy approximately 3,993 square feet of retail space in the Almeda Mall for a term of ten years.[3]  The Lease called for a minimum monthly rent of $4,824.88 plus five percent of annual gross sales over $1,100,000.[4]  The ten-year term of the Lease could be terminated early under certain circumstances, including those described in a "Gross Sales Kickout" clause in § 20.03, which states:

> Tenant shall have the right to terminate this Lease upon sixty (60) days written notice which must be given, if at all, within sixty (60) days of the end of the fifth (5th) Lease Year, if Tenant's Gross Sales do not exceed One Million and 00/100 Dollars ($1,000,000.00) in the fifth (5th) Lease Year.  Tenant's right to terminate the Lease . . . is contingent on the following:  (i) Tenant not being in default of the Lease at the time the termination notice is mailed and at the time the termination becomes effective; (ii) Tenant having continuously operated using good faith efforts to maximize its Gross Sales throughout the first five (5) Lease Years of the term . . .[5]

---

[1]Shoe Show "Company Info," Exhibit 2 to Plaintiff, Almeda Mall L.P.'s Memorandum in Support of Motion for Summary Judgment ("Almeda Mall's Motion"), Docket Entry No. 31.

[2]Lease Agreement, Exhibit 1 to Almeda Mall's Motion, Docket Entry No. 31.

[3]Id. §§ 1.01 and 1.03.

[4]Id. § 2.01.

[5]Id. § 20.03.

-2-

Shoe Show began operating a shoe store in the leased premises under the trade name "the SHOE DEPT." in 2003.  In March of 2007 Shoe Show opened a shoe store under the trade name "SHOE SHOW" in the Almeda Square Shopping Center approximately 400 feet from the perimeter of the Almeda Mall.[6] On July 27, 2007, Almeda Mall, L.P. purchased the Almeda Mall shopping center from San Mall, L.P. and became San Mall's successor in interest in regard to the Lease Agreement.[7] On April 18, 2008, Shoe Show sent Almeda Mall a letter stating that it intended to terminate the Lease under the "kickout" provision in § 20.03 of the Lease because the store's sales had not exceeded $1 million in the fifth year of the Lease term.[8]  Almeda Mall responded that Shoe Show was not entitled to exercise the "kickout" provision because it was in default of the Competition clause in § 4.08 of the Lease because of the operation of the SHOE SHOW store in the Almeda Square Shopping Center.[9]

The Competition clause states:

Section 4.08 – Competition

    Tenant agrees that so long as this Lease shall remain in effect, Tenant (or any officer, director or shareholder owning capital stock of Tenant) shall not,

---

[6]Affidavit of J.W. Manning, Exhibit E to Motion for Summary Judgment and Brief in Support Thereof ("Shoe Show's Motion"), Docket Entry No. 32, ¶ 6.

[7]Affidavit of Wayne Fox, Exhibit 2 to Almeda Mall's Motion, Docket Entry No. 31, ¶ 3.

[8]Id. ¶ 5.

[9]Id.

either directly or indirectly, own, operate or be financially interested in, either itself or with others, a business operating under the same or substantially similar trade name, as permitted by Section 4.01(c) of this Lease, within a radius of two (2) miles of the perimeter of the Regional Development.[10]

Clause 4.01(c), to which the Competition clause refers, states, "Tenant shall operate its business from the Premises under the following trade name only and under no other trade name:  The Shoe Dept."[11]  There is no dispute that the SHOE SHOW store in the Almeda Square Shopping Center was within two miles of "THE SHOE DEPT." store in the Almeda Mall.  The central dispute between the parties is whether "SHOE SHOW" and "THE SHOE DEPT." are "substantially similar trade names" within the meaning of the Competition clause.

Shoe Show informed Almeda Mall of its position that the two trade names are not substantially similar.  Shoe Show vacated the store in Almeda Mall on June 30, 2008, and stopped making rent payments.[12]

On August 7, 2008, Almeda Mall filed suit against Shoe Show for breach of contract in Harris County, Texas.[13]  Shoe Show removed the action on October 2, 2008, on diversity grounds (Docket Entry

---

[10]Lease Agreement, Exhibit 1 to Almeda Mall's Motion, Docket Entry No. 31., § 4.08.

[11]Id. § 4.01(c).

[12]Affidavit of Wayne Fox, Exhibit 2 to Almeda Mall's Motion, Docket Entry No. 31, ¶ 6.

[13]Plaintiff's Original Petition, Exhibit A to Notice of Removal, Docket Entry No. 1.

-4-

No. 1).   Almeda Mall filed a Motion for Summary Judgment on March 15, 2010 (Docket Entry No. 31).  Shoe Show filed a Motion for Summary Judgment on the same day (Docket Entry No. 32).   Both parties have offered Responses and Replies (Docket Entry Nos. 35, 36, 37, and 38).

## II.  **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.   FED. R. CIV. P. 56(c).   Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 106 S.Ct. at 2553-2554).

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits,

-5-

depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Id. (citing Celotex, 106 S.Ct. at 2553-2554). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097, 2110 (2000). Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075.

### III.  Breach of Contract

Almeda Mall argues that Shoe Show breached the Lease by vacating the premises and stopping rent payments before the end of the 10-year Lease term. Shoe Show argues that it was permitted to terminate the Lease under the "kickout" provision in § 20.03 of the Lease because the store's gross sales in the fifth year of the Lease were less than $ 1 million. Almeda Mall responds that Shoe Show was not entitled to use that provision because it requires that "(i) Tenant not be[ing] in default of the Lease at the time the termination notice is mailed and at the time the termination becomes effective."[14]  Almeda Mall argues that Shoe Show was in default of the Lease at that time because it had opened a SHOE SHOW store in the Almeda Square Shopping Center in violation of the

---

[14]Lease Agreement, Exhibit 1 to Almeda Mall's Motion, Docket Entry No. 31., § 20.03.

Competition clause in § 4.08, which requires the Tenant to not own or operate "a business operating under the same or substantially similar trade name" within two miles of THE SHOE DEPT. store in the Almeda Mall.[15]   Almeda Mall also argues that Shoe Show was not entitled to use the "kickout" provision because it also requires, "(ii) Tenant having continuously operated using good faith efforts to maximize its Gross Sales throughout the first five (5) Lease Years of the term."[16] Almeda Mall argues that Shoe Show's operation of a competing store in a neighboring shopping center to the Almeda Mall establishes that Shoe Show did not attempt in good faith to maximize its gross sales in the Almeda Mall store.

Shoe Show argues that "SHOE SHOW" and "THE SHOE DEPT." are not substantially similar trade names within the meaning of the contract.   Shoe Show further argues that its operation of a SHOE SHOW store in the Almeda Square Shopping Center does not constitute a lack of good faith effort to maximize sales in the Almeda Mall store because the two stores target different shopping demographics.

The parties do not dispute the material facts of the breach of contract action; what is in dispute is whether "SHOE SHOW" and "THE SHOE DEPT." are substantially similar trade names within the meaning of the contract.

---

[15]Id. § 4.08.

[16]Id. § 20.03.

-7-

A.    **Applicable Law**

1.    Choice of Law

While federal law establishes the standards for entry of summary judgment, in a diversity case the court looks to Texas law and its choice-of-law principles in determining what state's law to apply. Erie Railroad Co. v. Tompkins, 58 S.Ct. 817 (1938); General Accident Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd., 288 F.3d 651, 653 (5th Cir. 2002). Texas law gives effect to choice-of-law clauses regarding construction of a contract. Benchmark Elecs., Inc. v. J.M. Huber Corp., 343 F.3d 719, 727 (5th Cir. 2003) (citing In re J.D. Edwards World Solutions Co., 87 S.W.3d 546, 549 (Tex. 2002)).

The Lease contains a choice-of-law provision that states, "It is the intent of the parties hereto that all questions and/or disputes with respect to the construction of this Lease and the rights and the liabilities of the parties hereto shall be determined in accordance with the laws of the State of Ohio."[17] Both parties agree that Ohio law governs the dispute. The court will therefore apply Ohio law in construing the contract.

2.    Construction of Contracts Under Ohio Law

Under Ohio law leases are contracts and are subject to the traditional rules governing contract interpretation. Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust, 804 N.E.2d 979, 992

---

[17]Id. § 19.03.

-8-

(Ohio Ct. App. 2004).  In construing the terms of any contract, the principal objective is to determine the intent of the parties. Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos., 714 N.E.2d 898, 900 (Ohio 1999).  The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.  Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority, 678 N.E.2d 519, 526 (Ohio 1997). When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.  Westfield Ins. Co. v. Galatis, 797 N.E.2d 1256, 1261 (Ohio 2003).  Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.  Foster Wheeler, 678 N.E.2d at 526  (quoting Alexander v. Buckeye Pipe Line Co., 374 N.E.2d 146, 150 (Ohio 1978)).  When the terms included in an existing contract are clear and unambiguous, Ohio courts will not create a new contract by finding an intent not expressed in the clear and unambiguous language of the written contract.  Hamilton, 714 N.E.2d at 901, (quoting Alexander, 374 N.E.2d at 150).  When contract terms are clear and unambiguous, contract interpretation is a matter of law.  Long Beach Ass'n, Inc. v. Jones, 697 N.E.2d 208, 209-10 (Ohio 1998); Mark-It Place, 804 N.E.2d at 992.  As a matter of law, a contract is unambiguous if it can be given a definite legal meaning.  Westfield, 797 N.E.2d at 1261.

-9-

To establish a breach of contract under Ohio law, a plaintiff must show that a contract existed, the plaintiff performed, the defendant breached, and the plaintiff suffered damages.  <u>Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.</u>, N.E.2d 953, 957 (Ohio Ct. App. 2004).  The parties do not dispute that a contract existed or that Almeda Mall performed under the contract.  The parties dispute whether Shoe Show breached the contract and the amount, if any, of Almeda Mall's damages.

**B.    Analysis**

    1.    <u>Ambiguity</u>

To rule on a breach of contract claim the court must first determine whether the relevant contract language is ambiguous.  As a matter of law, a contract is unambiguous if it can be given a definite legal meaning.  <u>Westfield</u>, 797 N.E.2d at 1261.  The question in this action is whether the phrase "substantially similar trade name" has a definite legal meaning.  The court concludes that it does.

The term "trade name" has a defined legal meaning under Ohio law.  The chapter of the Ohio Labor and Industry Code dealing with Deceptive Trade Practices defines "trade name" as "a word, name, symbol, device, or combination of a word, name, symbol, or device in any form or arrangement used by a person to identify the person's business, vocation, or occupation and distinguish it from the business, vocation, or occupation of others."  Baldwin's Ohio

-10-

REVISED CODE ANNOTATED, R.C. § 4165.01. While this provision refers specifically to deceptive trade practices rather than contract interpretation, the court is satisfied that it is also relevant to issues of contract interpretation. The term "trade name" is defined by Black's Law Dictionary as follows:

> tradename. 1. A name, style, or symbol used to distinguish a company, partnership, or business (as opposed to a product or service); the name under which a business operates. • A tradename is a means of identifying a business — or its products or services — to establish goodwill. It symbolizes the business's reputation. Black's Law Dictionary (8th ed. 2004).

A trade name is thus the name that identifies a business. Moreover, because both definitions state that a symbol can be a trade name, it is clear that the term "trade name" encompasses not just the words in the name, but also the presentation of those words and the effect that the presentation has in identifying the business and distinguishing it from others.

The other words in the phrase are "substantially" and "similar." Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument. Foster Wheeler, 678 N.E.2d at 526. Nothing in the Lease suggests that these words should be given anything other than their ordinary meaning. "Substantially" is the adverbial form of "substantial," which in this context means "being such with respect to essentials." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY, 2d ed. 1999. "Similar" means "having a likeness or

-11-

resemblance" or "having qualities in common." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY, 2d ed. 1999. Thus, trade names that are "substantially similar" will have essential elements in common. Superficial similarities in wording or appearance will not suffice.

Because "trade name" has a definite legal meaning in Ohio and the terms "substantially" and "similar" appear in the contract with their plain and ordinary meanings, the court concludes that the phrase "substantially similar trade name" is clear and unambiguous. The parties agree that the contract is unambiguous.[18] Because the language is clear, the court will not consider writings outside of the contract to find the intent of the parties. See Westfield, 797 N.E.2d at 1261. Also, because the terms are clear and unambiguous, the court may interpret them as a matter of law. See Mark-It Place, 804 N.E.2d at 992. Since there are no material fact issues in dispute and the court may interpret the contract as a matter of law, summary judgment is appropriate.

2. Substantially Similar Trade Name

The two trade names in question are "SHOE SHOW" and "THE SHOE DEPT." The court concludes that these names are substantially similar. The essential elements of both names are the word "SHOE" followed by another four-letter-word in all capitals. While the

_____

[18]See Shoe Show's Motion, Docket Entry No. 32, p. 22 ("The Lease language is clear and unambiguous"); see also Plaintiff, Almeda Mall L.P.'s Response to Defendants' Motion for Summary Judgment, Docket Entry No. 34, p. 8.

words "show" and "dept." do not mean the same thing, when paired
with the word "shoe" they both suggest a place where a person could
buy shoes.    The intended audience of shoppers would likely
interpret the two names to mean essentially the same thing -- this
is a store that sells shoes.  Visually, the names appear very
similar on the front of stores.[19]   Although the name "THE SHOE
DEPT." contains three words while "SHOE SHOW" contains only two,
the article "the" appears in much smaller letters to the upper left
of "SHOE DEPT.," with the effect that the latter two words are the
emphasized part of the name.    While the two trade names employ
slightly different fonts -- the capital letters in SHOE SHOW are
more rounded than those in SHOE DEPT. -- both employ sans-serif
capital letters of comparable proportions, with the result that
both names look similar on store fronts.  The court concludes that
because the names are similar in structure, meaning, and
appearance, the trade names are substantially similar within the
meaning of the contract.

This conclusion is consistent with Ohio case law applying the
term "substantially similar" to trade names.  In Cleveland Opera
Co. v. Cleveland Civic Opera Association, Inc., 154 N.E. 352, 353-
54 (Ohio Ct. App. 1926), the Ohio Eighth District Court of Appeals
concluded that the trade names "Cleveland Opera Company" and

---

[19]Photographs of store fronts, Exhibit I to Shoe Show's Motion,
Docket Entry No. 32.

-13-

"Cleveland Civic Opera Association, Inc." were so "substantially similar" that use of the name "Cleveland Civic Opera Association, Inc." would constitute unfair competition. Although the present action deals with contract interpretation rather than unfair competition, the relevant contract language appears in the Lease clause dealing with "Competition;" and thus, the Ohio court's use of the term "substantially similar" in the context of the trade name's competitive effect is relevant. The court in <u>Cleveland Opera Co.</u> was confronted with two names which, although one contained more words than the other and used the word "Association" where the other used "Co.," were still "substantially similar" because they would imply the same meaning to the intended audience. The Ohio court stated that "it seems to us from an analysis of the names themselves that there is not that dissimilarity or contrast that would attract the eye or the mind of the public." <u>Id.</u> at 353. This analysis applies to the trade names at issue in this action as well, since there is no difference in meaning or appearance in the names that would suggest to a shopper that the two stores are not essentially similar.

Shoe Show argues that a more recent case, <u>Leventhal & Associates, Inc. v. Thomson Central Ohio</u>, 714 N.E.2d 418 (Ohio Ct. App. 1998), supports a different result in this action. In <u>Leventhal</u> the Ohio Tenth Court of Appeals held that the trade name "Columbus Curiocity for Kids" was not so similar to the name "Kids Connection" as to constitute a common-law deceptive trade practice.

-14-

Id. at 423.  Although the case dealt with deceptive trade practice allegations rather than issues of contract interpretation, the court's analysis of the similarities of two trade names is instructive.  In that case, the only shared word between the two names was the word "Kids," which appears at the beginning of one name as a subject and at the end of the other as the object of a preposition.  The name "Columbus Curiocity for Kids" has twice the number of words as "Kids Connection," and specifies a geographic region while the name "Kids Connection" does not.  Leventhal provides an example of how two trade names can be sufficiently dissimilar for a court to hold them not to be similar as a matter of law.  The trade names at issue in this action, by contrast, are far more similar than were the names at issue in Leventhal.  The names are more similar in appearance and meaning, and the most prominent word in both names -- shoe -- is used in the same place and in the same way in both names.

Shoe Show points out that the names sound different, because a person speaking would pronounce the name "DEPT." as the three-syllable word "department."  Shoe Show may be correct, but the court concludes that the visual impact of the trade names is more significant than their pronunciation because shoppers are more likely to experience the trade names visually -- by seeing the trade names on a store front, a shopping bag, a sign, etc. -- rather than by hearing them.  Since the phrase "substantially similar trade name" appears in a clause addressing competition to

the store in Almeda Mall, it is relevant to consider the probable impact that a trade name will have on shoppers.  It is also worth noting that Shoe Show chose the contracted form "DEPT." for the store's trade name rather than the full word "Department"; it is fair to infer that the visual impact of the contracted form in conjunction with the word "SHOE" was significant in that choice. The court is not convinced that any difference in the pronunciation of the spoken form of the trade names sufficiently differentiates the names to render them not "substantially similar."

## C.    Conclusion

Because "SHOE SHOW" and "THE SHOE DEPT." are substantially similar trade names, and because Shoe Show was operating a business under the trade name "SHOE SHOW" within two miles of "THE SHOE DEPT." store in the Almeda Mall in June of 2008, Shoe Show was in default of § 4.08 of the Lease when it ceased making rent payments. Shoe Show was therefore not entitled to terminate the Lease under the "kickout" provision of § 20.03 at that time, and Shoe Show's failure to make rental payments since June of 2008 constitutes a breach of contract.  Because Shoe Show was in default of the Lease as a matter of law, and because there are no material issues in dispute, Almeda Mall is entitled to summary judgment on its breach of contract claim.[20]

---

[20]Because the court has concluded that Shoe Show was in default under § 4.08 of the Lease, the court will not consider Almeda Mall's alternative argument that Shoe Show did not operate in good faith.

-16-

## IV.   **Damages**

Almeda Mall seeks summary judgment on the amount of damages. For the reasons explained below, the court concludes that Almeda Mall has not proven the amount of its damages as a matter of law.

## A.   **Calculating the Damages**

The Lease provides remedies for the landlord in the event of the tenant's default in § 13.02, which provides that upon default:

> . . . Tenant shall be liable for all damages sustained by Landlord, including, without limitation, all rent through the remainder of the term of this Lease, including Minimum Rent, Additional Rent, and Percentage Rent (equal to the greater of (i) an annual rate of the average annual Percentage Rent owed by Tenant from the Term Commencement Date through the date of Default, and (ii) the amount calculated pursuant to Section 4.02(b) of this Lease), and reasonable attorneys' fees. . . .   In determining Landlord's damages, (aa) all sums which are past due at the time of the award shall include an interest charge, as set forth in Section 2.07 of this Lease, from the due date as set forth herein until the time of the award, (bb) and all sums which would not have accrued at the time of the award but for Tenant's Default or abandonment or vacating of the Premises shall be discounted at the rate of five percent (5%) per annum, after first being reduced by the amount of rental loss Tenant proves could have been or could be reasonably avoided, which sum shall also be discounted at the rate of five percent (5%) per annum.[21]

Calculating the proper award under § 13.02 is not a trivial matter. It includes three types of rent, each subject to interest charges for amounts past due and discounting for rent due after the date of the award.   The types of rent are:  (1) Minimum Rent, which is set

---

[21]Lease Agreement, Exhibit 1 to Almeda Mall's Motion, Docket Entry No. 31, § 13.02(c).

in § 2.01 at $4,824.88 per month; (2) Additional Rent, the term in § 2.05 for most of the Tenant's other payment obligations under the Lease, including a Late Charge under § 2.07, certain utilities under § 4.03, a proportionate share of common area expenses under § 5.03, a proportionate share of real estate taxes under § 7.01, a proportionate share of insurance charges under § 8.02, and a Media Fund under § 19.14; and (3) Percentage Rent, which is defined in § 2.02 as five percent of annual gross sales over $1,100,000, although with some complications in exactly how the amount is calculated.

In the event that a party is found to have breached the Competition clause in § 4.08, the Lease provides the following regarding the calculation of Percentage Rent:

> Due to the difficulty in determining the extent to which Landlord would be damaged as a result of Tenant breach of the foregoing covenant [i.e. the Section 4.08 Competition covenant], it is agreed that in the event of such breach Landlord shall, in addition to any other legal or equitable remedies otherwise available, be entitled to include one hundred percent (100%) of the Gross Sales from any such location established in violation of the foregoing covenant in Gross Sales from the Premises for purposes of calculating Percentage Rent due pursuant to this Lease. Moreover, in the event Tenant fails to supply to Landlord sales records with respect to any such similar or competing business, Landlord shall have the right to estimate the gross sales for such businesses based upon Gross Sales in the Premises, and the additional Percentage Rent generated from the inclusion of such estimated gross sales shall be deemed Percentage Rent to be paid by Tenant in accordance with the provisions of this Lease.[22]

---

[22]Lease Agreement, Exhibit 1 to Almeda Mall's Motion, Docket Entry No. 31, § 4.08.

-18-

Under this provision Almeda Mall is entitled to add the sales from the "SHOE SHOW" store to those from "THE SHOE DEPT." store in calculating Gross Sales, and is entitled to estimate those sales, based on sales in "THE SHOE DEPT.," where Shoe Show fails to provide them.

In the event that Shoe Show vacates the store in the Almeda Mall, Almeda Mall is entitled to calculate Percentage Rent as "the greater of (i) an annual rate of the average annual Percentage Rent owed by Tenant from the Term Commencement Date through the date of Default, and (ii) the amount calculated pursuant to Section 4.02(b) of this Lease."[23] Section 4.02(b) of the Lease provides that in the event the Tenant abandons the store Almeda Mall is entitled to "increase by twenty-five percent (25%) the Minimum Rent reserved for the period of Tenant's failure to do business," which results in a monthly Percentage Rent of $1,206.22 and an annual Percentage Rent of $14,474.64. In practical terms, this means that unless "the average annual Percentage Rent owed by Tenant from the Term Commencement Date through the date of Default" was calculated upon annual Gross Sales exceeding $1,389,492.80, the proper calculation of Percentage Rent post-default will be $14,474.64 per year.

Section 13.02(c)(ii) allows for the recovery of "reasonable attorneys' fees." Under Ohio law contractual agreements to pay another party's attorney's fees are typically "enforceable and not

---

[23]Id. § 13.02.

void as against public policy so long as the fees awarded are fair, just and reasonable as determined by the trial court upon full consideration of all of the circumstances of the case." Wilborn v. Bank One Corp., 906 N.E.2d 396, 400 (Ohio 2009) (quoting Nottingdale Homeowners' Assn., Inc. v. Darby, 514 N.E.2d 702, 703 (Ohio 1987)).  A party seeking an award of attorney's fees has the burden of demonstrating the reasonable value of such services. Hikmet v. Turkoglu, 2009 WL 4699101, *16 (Ohio Ct. App. 2009).  A party seeking attorney's fees in federal court bears the burden of producing adequate documentation of the hours spent litigating the claims.  See League of United Latin American Citizens No. 4552 (LULAC) v. Roscoe Independent School District, 119 F.3d 1228, 1232-33 (5th Cir. 1997).  Specifically, the moving party must detail the hours expended in a manner that is sufficient for the court to confirm that the party has met its burden.  Id.

**B.   Almeda Mall's Claimed Damages**

Almeda Mall seeks an award of $1,007,272, which is composed of $403,620 of damages past due with accrued interest, $463,651 for future damages due, and $140,000 for attorney's fees.  Almeda Mall has provided a spreadsheet detailing how the past and present damages were calculated.[24]  The spreadsheet lists the various component damages assessed for every month starting from default on

---

[24]Calculation of Damages, Exhibit 3 to Almeda Mall's Motion, Docket Entry No. 31.

July 1, 2008, to the end of the Lease term on March 1, 2013.  There are a number of problems with the spreadsheet, however.

The first problem is that Almeda Mall provides no evidence substantiating the amounts included for utilities, common area expenses, real estate taxes, or insurance.  These amounts add up to approximately $7,000 per month, and nearly $400,000 over the fifty-seven months listed on the spreadsheet.  Given the sums involved, Almeda Mall is obligated to provide more than numbers on a spreadsheet to establish that these amounts are correct.  Because there are material questions of fact concerning these damage numbers, the court cannot grant summary judgment on the issue of damages.

Second, the spreadsheet contains errors in calculating the damages.  The spreadsheet lists both Liquidated Damages calculated under § 4.02(b) and Percentage Rent calculated as a percentage of sales over $1,100,000, pursuant to § 2.02 and § 4.08.  Section 13.02, however, provides that the Percentage Rent upon default will be calculated either as the amount under § 4.02(b) or "an annual rate of the average annual Percentage Rent owed by Tenant from the Term Commencement Date through the date of Default," whichever is greater.  In this instance the amount calculated under § 4.02(b) is greater, so that is the amount that Almeda Mall is entitled to as Percentage Rent; it is not entitled to an award based on average past Gross Sales as well.

-21-

A further problem with Almeda Mall's calculation of Percentage Rent due is that it is based on future estimates of Gross Sales that have no basis in reality.  When both businesses were in operation, Almeda Mall was permitted under § 4.08 to add the sales of "SHOE SHOW" to those of "THE SHOE DEPT." to calculate Gross Sales.  For those years in which both stores were actually in operation, the combined sales for the two stores never exceeded $1,100,000.[25]  The "annual rate of the average annual Percentage Rent owed by Tenant from the Term Commencement Date through the date of Default" is therefore zero because Shoe Show never passed the Percentage Sales breakpoint at any time before default.  Almeda Mall, however, calculates Percentage Rent based upon an increasing combined Gross Sales for the two stores that reaches $1,376,789 in 2013.  There is no support for this number because neither store has been in operation since 2008.[26]  The Lease does not allow Almeda Mall to charge Percentage Rent for sales that never happened, except where specifically allowed by § 13.02.  For these reasons, Almeda Mall is not entitled to any of the Percentage Rent shown on the spreadsheet other than the amounts listed as "Liquidated Damages."

A third problem is that the Spreadsheet lists "Media Fund" charges as $199.65 per month.  The correct charge under § 19.14 is

---

[25]Sales Curve Projection, Exhibit 3 to Almeda Mall's Motion, Docket Entry No. 31.

[26]Id., showing no sales for Shoe Show after August of 2008.

$0.50 per square foot annually, which for a 3,993 square foot store means $1,996.50 per year, which translates into a monthly payment of $166.38.

Fourth, § 13.02 allows for interest charges on amounts past due up until the time of the award, but requires discounting, rather than interest charges, for all damages that "would not have accrued at the time of the award." The spreadsheet appears to have applied the provision correctly up until its projected time of award in May of 2010, but then continues to list accrued interest payments in the period after the award, building up to a monthly interest charge of $20,497.85 in March of 2013. This is incorrect; the spreadsheet should discount the amounts due after the award at an annual rate of five percent, and should assess no accrued interest charges after the date of the award.

Fifth, Almeda Mall requests $140,000 in attorney's fees, but the affidavit provided by Almeda Mall's attorney provides substantiation for only $64,800 in attorney's fees (216 hours at $300 an hour).[27] There is no explanation for the additional $76,200 in attorney's fees that Almeda Mall requests.

## C.  Conclusion

Given the lack of substantiation for significant components of Almeda Mall's claimed damages, as well as Almeda Mall's errors in

---

[27]Affidavit of Julian J. Fertitta, III, Exhibit 8 to Almeda Mall's Motion, Docket Entry No. 31, ¶ 4.

calculating the amount properly due under the terms of the Lease, the court cannot make an award of damages in this Memorandum Opinion and Order or enter a final judgment. The parties will have thirty days from entry of this Memorandum Opinion and Order to agree on the correct amount of damages or to submit affidavits and briefing establishing the proper amount of damages.

## V.  Conclusion and Order

For the reasons explained above, the court concludes that "SHOE SHOW" and "THE SHOE DEPT." are substantially similar trade names within the meaning of the Lease Agreement and, therefore, that Shoe Show breached its contract with Almeda Mall when it abandoned its store in the Almeda Mall and ceased paying rent prior to the end of the Lease term. Therefore, Almeda Mall's Motion for Summary Judgment (Docket Entry No. 31) is **GRANTED** as to liability and **DENIED** as to damages; and Shoe Show's Motion for Summary Judgment (Docket Entry No. 32) is **DENIED.**

The parties are **ORDERED** to submit a stipulation of the damages due Almeda Mall or to submit briefing and affidavits establishing the proper amount of breach of contract damages within thirty (30) days of entry of this Memorandum Opinion and Order.

**SIGNED** at Houston, Texas, on this the 2nd day of June, 2010.

SIM LAKE
UNITED STATES DISTRICT JUDGE

-24-